**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| GEORGE A. MENOLD, Individually and On Behalf of All Others Similarly Situated, | ) CLASS ACTION |
| Plaintiff, | ) Case No. |
| v. | ) COMPLAINT FOR VIOLATION OF ) THE FEDERAL SECURITIES LAWS |
| NAVIENT CORPORATION, JOHN F. REMONDI, and SOMSAK CHIVAVIBUL, | ) ) DEMAND FOR JURY TRIAL |
| Defendants. | ) ) |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff George A. Menold ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Navient Corporation ("Navient" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.       This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Navient securities between May 9, 2014 and February 5, 2016, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.       Navient provides financial products and services in the United States. The company operates in four segments: Federal Family Education Loan Program ("FFELP") Loans, Private Education Loans, Business Services, and Other. The Company provides FFELP loans and servicing for FFELP loan portfolios; and servicing and asset recovery services for loans on behalf of guarantors of FFELP loans, guaranty agencies, higher education institutions, the United States Department of Education, and other federal clients, as well as states, courts, and municipalities. Navient also acquires, finances, and services private education loans.

3.       Navient was formerly the loan management, servicing, and asset recovery business of SLM Corporation ("Sallie Mae").  On April 1, 2014, the board of Sallie Mae approved the strategic separation of Navient from Sallie Mae's consumer banking business.  Navient common stock began trading on the Nasdaq under the ticker symbol "NAVI" on May 1, 2014.

4.       Navient is headquartered in Wilmington, Delaware.

5.       Throughout the Class Period, defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company's loan servicing practices were not in compliance with applicable federal regulations; (ii) the Company's non-compliance with federal regulations could subject Navient and its

subsidiaries to restitution, civil monetary penalties, and corrective actions; and (iii) as a result of the foregoing, Navient's public statements were materially false and misleading at all relevant times.

6.     On August 24, 2015, post-market, the Company reported that on August 19, 2015, the Company's wholly-owned subsidiary Navient Solutions, Inc. ("NSI") had received a Notice and Opportunity to Respond and Advise ("NORA") letter providing notice that the CFPB's Office of Enforcement was considering recommending that CFPB take legal action against NSI related to the previously disclosed investigation regarding assessing late fees on student loans and other related misconduct, and that the CFPB might seek restitution, civil monetary penalties, and corrective action against NSI.

7.     On this news, the Company's shares fell $1.01, or nearly 7.73% to close at $12.05 on August 25, 2015.

8.     On February 6, 2016, U.S. presidential candidate Hillary Clinton directed public attention to the subject of the CFPB's investigation of Navient during a speech at New England College in Henniker, New Hampshire, stating that Navient's "behavior is outrageous" and that the Company has been "misleading people" and "doing some really terrible things."

9.     On this news, Navient stock fell $0.57, or 5.99%, to close at $8.94 on the following trading day, February 8, 2016.

10.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

13.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as the Company is headquartered within this District.

14.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

15.     Plaintiff, as set forth in the attached Certification, acquired Navient securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

16.     Defendant Navient is incorporated in Delaware, and the Company's principal executive offices are located at 123 Justison Street, Wilmington, Delaware 19801.

17.     Defendant John F. Remondi ("Remondi") has served at all relevant times as the Company's Chief Executive Officer.

18.     Defendant Somsak Chivavibul ("Chivavibul") has served at all relevant times as the Company's Chief Financial Officer.

19.     The defendants described in ¶¶ 17-18 are sometimes hereinafter referred to as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

20.     Navient provides financial products and services in the United States.   The Company operates in four segments: FFELP Loans, Private Education Loans, Business Services, and Other.   The Company provides FFELP loans and servicing for FFELP loan portfolio; and servicing and asset recovery services for loans on behalf of guarantors of FFELP loans, guaranty agencies, higher education institutions, the United States Department of Education, and other federal clients, as well as states, courts, and municipalities.   Navient also acquires, finances, and services private education loans.

### Materially False and Misleading Statements Issued During the Class Period

21.     The Class Period begins on May 9, 2014, when Navient filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2014 (the "Q1 2014 10-Q").   For the quarter, Navient reported net income of $219 million, or $0.49 per diluted share, on net revenue of $936 million.

22.     In the Q1 2014 10-Q, Navient stated, in part:

*Navient's Strengths and Opportunities*

Navient possess a number of competitive advantages that distinguishes it from its competitors, including:

. . .

***Superior operating performance.***   Navient has demonstrated superior default prevention performance and industry leading asset recovery services.   Navient ranks first in cumulative default prevention performance according to an analysis of ED's servicing contract results statistics since the start of the contract in 2009. Federal loan customers with loans serviced by Navient default at a rate 30 percent lower than the national average.   **Navient prides itself in a robust compliance culture driven by a "customer first" approach.**

(Emphasis added.)

. . .

NSI has also received Civil Investigative Demands ("CIDs") from the Consumer Financial Protection Bureau (the "CFPB") as part of the CFPB's separate investigation regarding allegations relating to Navient's disclosures and assessment of late fees. Navient recently commenced discussions with the CFPB relating to the customer billing statement disclosures and assessment of late fees. Reserves have not been established for this matter as such estimate cannot be made at this time. Navient and its subsidiaries will remain subject to the CIDs.

23.     The Q1 2014 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual Defendants, stating that the financial information contained in the Q1 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

24.     On August 1, 2014, Navient filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 10-Q").   For the quarter, Navient reported net income of $307 million, or $0.71 per diluted share, on net revenue of $937 million.

25.     In the Q2 2014 10-Q, Navient stated, in part:

***Navient's Strengths and Opportunities***

Navient possess a number of competitive advantages that distinguishes it from its competitors, including:
. . .
***Superior operating performance.***   Navient has demonstrated superior default prevention performance and industry leading asset recovery services.   Navient ranks first in cumulative default prevention performance according to an analysis

of ED's servicing contract results statistics since the start of the contract in 2009. Federal loan customers with loans serviced by Navient default at a rate 30 percent lower than the national average.  **Navient prides itself in a robust compliance culture driven by a "customer first" approach.**

(Emphasis added.)

. . .

NSI has also received Civil Investigative Demands ("CIDs") from the Consumer Financial Protection Bureau (the "CFPB") as part of the CFPB's separate investigation regarding allegations relating to Navient's disclosures and assessment of late fees and other matters. Navient has been in discussions with the CFPB relating to these matters and is cooperating with the investigation. We are not in a position at this time to predict the duration or the outcome of this investigation and reserves have not been established for this matter.

26.     The Q2 2014 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q2 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

27.     On October 30, 2014, Navient filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 10-Q").  For the quarter, Navient reported net income of $359 million, or $0.85 per diluted share, on net revenue of $912 million.

28.     In the Q3 2014 10-Q, Navient stated, in part:

***Navient's Strengths and Opportunities***

Navient possess a number of competitive advantages that distinguishes it from its competitors, including:
. . .
***Superior operating performance.***  Navient has demonstrated superior default prevention performance and industry leading asset recovery services.  Navient ranks first in cumulative default prevention performance according to an analysis of ED's servicing contract results statistics since the start of the contract in 2009. Federal loan customers with loans serviced by Navient default at a rate 30 percent lower than the national average.  **Navient prides itself in a robust compliance culture driven by a "customer first" approach.**

(Emphasis added.)

. . .

NSI has also received Civil Investigative Demands ("CIDs") from the Consumer Financial Protection Bureau (the "CFPB") as part of the CFPB's separate investigation regarding allegations relating to Navient's disclosures and assessment of late fees and other matters. Navient has been in discussions with the CFPB relating to these matters and is cooperating with the investigation. We are not in a position at this time to predict the duration or the outcome of this investigation and reserves have not been established for this matter.

29.     The Q3 2014 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q3 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

30.     On February 27, 2015, Navient filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2014 10-K").  For the quarter, Navient reported net income of $263 million, or $0.64 per diluted share, on net revenue of $786 million.  For the year, Navient reported net income of $1.15 billion, or $2.69 per diluted share, on net revenue of $3.57 billion, compared to net income of $1.42 billion, or $3.12 per diluted share, on net revenue of $4.05 billion for 2013.

31.     In the 2014 10-K, Navient stated, in part:

***Navient's Strengths and Opportunities***

Navient possess a number of competitive advantages that distinguishes it from its competitors, including:
. . .
***Superior operating performance.***   Navient has demonstrated superior default prevention performance and industry leading asset recovery services.  Navient ranks first in cumulative default prevention performance according to an analysis of ED's servicing contract results statistics since the start of the contract in 2009. Federal loan customers with loans serviced by Navient default at a rate 30 percent lower than the national average.  **Navient prides itself in a robust compliance culture driven by a "customer first" approach.**

(Emphasis added.)

. . .

The Consumer Financial Protection Act, a part of the Dodd-Frank Act, established the Consumer Financial Protection Bureau ("CFPB"), which has broad authority to write regulations under federal consumer financial protection laws and to directly or indirectly enforce those laws and examine financial institutions for compliance. The CFPB is authorized to impose fines and provide consumer restitution in the event of violations, engage in consumer financial education, track consumer complaints, request data and promote the availability of financial services to underserved consumers and communities. It has authority to prevent unfair, deceptive or abusive practices by issuing regulations that define the same or by using its enforcement authority without first issuing regulations. The CFPB has been active in its supervision, examination and enforcement of financial services companies, most notably bringing enforcement actions, imposing fines and mandating large refunds to customers of several large banking institutions for practices relating to the sale of additional products associated with the extension of consumer credit.

. . .

As previously disclosed in April 2014, NSI received a Civil Investigative Demand ("CID") from the Consumer Financial Protection Bureau (the "CFPB") as part of the CFPB's separate investigation regarding allegations relating to Navient's disclosures and assessment of late fees and other matters. Navient has been in discussions with the CFPB relating to these matters, is cooperating with the investigation and is committed to resolving any potential concerns. It is not possible at this time to estimate a range of potential exposure, if any, for amounts that may be payable in connection therewith and reserves have not been established in this matter.

In November 2014, NSI's subsidiary, Pioneer Credit Recovery, Inc. ("Pioneer"), received a CID from the CFPB as part of the CFPB's investigation regarding Pioneer's activities relating to rehabilitation loans and collection of defaulted student debt. Navient has been in discussions with the CFPB relating to this matter, is cooperating with the investigation and is committed to resolving any potential concerns. It is not possible at this time to estimate a range of potential exposure, if any, for amounts that may be payable in connection therewith and reserves have not been established in this matter.

32.    The 2014 10-K contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

33.     On April 30, 2015, Navient filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 10-Q").  For the quarter, Navient reported net income of $292 million, or $0.72 per diluted share, on net revenue of $832 million, compared to net income of $219 million, or $0.49 per diluted share, on net revenue of $936 million for the same period in the prior year.

34.     In the Q1 2015 10-Q, Navient stated, in part:

*Navient's Strengths and Opportunities*

Navient possess a number of competitive advantages that distinguishes it from its competitors, including:
. . .
***Commitment to compliance and customer centricity.*** Navient fosters a robust compliance culture driven by a "customer first" approach. We invest in rigorous training programs, internal and external auditing, escalated service tracking and analysis, and customer research to enhance our compliance and customer service.

. . .

As previously disclosed, the Company and various of its subsidiaries are subject to the following investigations and inquiries:
. . .
* In April 2014, NSI received a CID from the Consumer Financial Protection Bureau (the "CFPB") as part of the CFPB's separate investigation regarding allegations relating to Navient's disclosures and assessment of late fees and other matters. Navient has been in discussions with the CFPB and has received a series of supplemental CIDs on these matters.

* In November 2014, NSI's subsidiary, Pioneer Credit Recovery, Inc. ("Pioneer"), received a CID from the CFPB as part of the CFPB's investigation regarding Pioneer's activities relating to rehabilitation loans and collection of defaulted student debt. Navient has been in discussions with the CFPB and has received a supplemental CID on these matters.

35.     The Q1 2015 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

36.     On August 3, 2015, Navient filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q").  For the quarter, Navient reported net income of $182 million, or $0.47 per diluted share, on net revenue of $750 million, compared to net income of $307 million, or $0.71 per diluted share, on net revenue of $937 million for the same period in the prior year.

37.     In the Q2 2015 10-Q, Navient stated, in part:

***Navient's Strengths and Opportunities***

Navient possess a number of competitive advantages that distinguishes it from its competitors, including:
. . .
***Commitment to compliance and customer centricity.*** Navient fosters a robust compliance culture driven by a "customer first" approach. We invest in rigorous training programs, internal and external auditing, escalated service tracking and analysis, and customer research to enhance our compliance and customer service.

. . .

As previously disclosed, the Company and various of its subsidiaries are subject to the following investigations and inquiries:
. . .

- In April 2014, NSI received a CID from the Consumer Financial Protection Bureau (the "CFPB") as part of the CFPB's separate investigation regarding allegations relating to Navient's disclosures and        assessment of late fees and other matters. Navient has received a series of supplemental CIDs on these matters.

- In November 2014, Navient's subsidiary, Pioneer Credit Recovery, Inc. ("Pioneer"), received a CID from the CFPB as part of the CFPB's investigation regarding Pioneer's activities relating to rehabilitation loans and collection of defaulted student debt.

38.     The Q2 2015 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

39.     The statements referenced in ¶¶ 21-38 were materially false and misleading because defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company's loan servicing practices were not in compliance with applicable federal regulations; and (ii) as a result of the foregoing, Navient's public statements were materially false and misleading at all relevant times.

**The Truth Begins To Emerge**

40.     On August 24, 2015, post-market, the Company reported that on August 19, 2015, NSI had received a NORA letter providing notice that the CFPB's Office of Enforcement was considering recommending that CFPB take legal action against NSI related to a previously disclosed investigation relating to the issuance of late fees on student loans and other related misconduct, and that the CFPB might seek restitution, civil monetary penalties, and corrective action against NSI.

41.     On this news, the Company's shares fell $1.01, or nearly 7.73% to close at $12.05 on August 25, 2015.

42.     On February 6, 2016, U.S. presidential candidate Hillary Clinton directed public attention to the subject of the CFPB's investigation of Navient during a speech at New England College in Henniker, New Hampshire, stating that Navient's "behavior is outrageous" and that the Company has been "misleading people" and "doing some really terrible things."

43.     On this news, Navient stock fell $0.57, or 5.99%, to close at $8.94 on the following trading day, February 8, 2016.

44.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

45.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Navient securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

46.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Navient securities were actively traded on the Nasdaq.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Navient or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

47.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

48.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

49.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Navient;

- whether the Individual Defendants caused Navient to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Navient securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

50.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

51.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Navient securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the Nasdaq and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Navient securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

52.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

53.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

54.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

56.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Navient securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Navient securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

57.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Navient securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Navient's finances and business prospects.

58.     By virtue of their positions at Navient, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose

such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

59.    Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Navient securities from their personal portfolios.

60.    Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of Navient, the Individual Defendants had knowledge of the details of Navient's internal affairs.

61.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Navient.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Navient's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Navient securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Navient's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Navient securities at artificially inflated prices and relied upon the price of the securities,

the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

62.     During the Class Period, Navient securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Navient securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Navient securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Navient securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

63.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

64.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

65.     Plaintiff repeats and realleges each and every allegation contained in the foregoing

paragraphs as if fully set forth herein.

66.     During the Class Period, the Individual Defendants participated in the operation

and management of Navient, and conducted and participated, directly and indirectly, in the conduct

of Navient's business affairs.  Because of their senior positions, they knew the adverse non-public

information about Navient's misstatement of income and expenses and false financial statements.

67.     As officers and/or directors of a publicly owned company, the Individual

Defendants had a duty to disseminate accurate and truthful information with respect to Navient's

financial condition and results of operations, and to correct promptly any public statements issued

by Navient which had become materially false or misleading.

68.     Because of their positions of control and authority as senior officers, the Individual

Defendants were able to, and did, control the contents of the various reports, press releases and

public filings which Navient disseminated in the marketplace during the Class Period concerning

Navient's results of operations.  Throughout the Class Period, the Individual Defendants exercised

their power and authority to cause Navient to engage in the wrongful acts complained of herein.

The Individual Defendants therefore, were "controlling persons" of Navient within the meaning

of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct

alleged which artificially inflated the market price of Navient securities.

69.     Each of the Individual Defendants, therefore, acted as a controlling person of

Navient.  By reason of their senior management positions and/or being directors of Navient, each

of the Individual Defendants had the power to direct the actions of, and exercised the same to

cause, Navient to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Navient and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

70.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Navient.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

OF COUNSEL:

**ANDREWS & SPRINGER, LLC**

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
Marc Gorrie
600 Third Avenue, 20th Floor
New York, New York 10016
Tel.:  (212) 661-1100
Fax:  (212) 661-8665
Email:  jalieberman@pomlaw.com
       ahood@pomlaw.com
       mgorrie@pomlaw.com

By: */s/ Peter B. Andrews*
Peter B. Andrews (# 4623)
Craig J. Springer (# 5529)
David M. Sborz (#6203)
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807
Tel.: (302) 504-4957
Fax: (302) 397-2681
Email:  pandrews@andrewsspringer.com
       cspringer@andrewssrpringer.com
       dsborz@andrewsspringer.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Tel.:  (312) 377-1181
Fax:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

**BRONSTEIN, GEWIRTZ
  & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Tel.: (212) 697-6484
Fax: (212) 697-7296
Email:  peretz@bgandg.com

DATED: February 11, 2016